UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
           Plaintiff, )
            )    No. 1:15-cv-952
-v- )
            )    HONORABLE PAUL L. MALONEY
M.G.H. FAMILY HEALTH CENTER, )
           Defendant. )
_____)

## OPINION

"The regarded-as-disabled prong of the ADA protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (internal citations and quotation marks omitted).

This case presents a peculiar fact-pattern that represents a textbook case for unlawful discrimination under the regarded-as-disabled prong of the ADA.

In September 2013, Defendant M.G.H. Family Health Center (MGH) hired Avis Lane as a community outreach coordinator. MGH normally required a new hire to undergo a "post-offer" physical with its third-party medical evaluator, Workplace Health, prior to beginning work. Ordinarily, that simple requirement presents little problem under the ADA.

However, in this case, Lane was assigned employment duties before undergoing a physical, and Workplace Health subsequently recommended that Lane be placed on a medical hold (—even though it initially did not receive a job description and was unaware Lane had begun work).

1

Peter Fries, the Physician Assistant who briefly examined Lane, found that while she passed the physical examination itself, Lane's medical records revealed impairments that concerned him and warranted a "medical hold." After receiving the job description, he determined that Lane should not begin work until a functional capacity evaluation (FCE) was performed.

Little did Fries know, Lane continued to work.

After fourteen days of successful work, Lane was suddenly confronted by MGH officials, who noted that Workplace Health had recommended Lane be put on a "medical hold" and undergo a costly FCE, which MGH would not pay for. Lane indicated that she was willing to pay for the FCE, but the conversation shifted, and MGH encouraged Lane to obtain a medical clearance from her own doctor (an MGH provider, no less), which she did.

Meanwhile, despite receiving Lane's full medical clearance, a revised job description with lower lifting requirements, and learning late that Lane had successfully performed the job responsibilities for her sedentary position for five weeks, Fries still refused to change his recommendation. MGH then abruptly ended the individualized inquiry by terminating Lane without paying for the FCE or at a minimum, following up with Lane on her offer to pay for the FCE.

The trouble for MGH, then, is that direct evidence of its unlawful discrimination is laid bare: MGH, by its own admission, fired Lane because it perceived her impairments as rendering her ineligible for the position—but it did so prior to the completion of any individualized inquiry by Workplace Health.

As it turns out, Lane was "perfectly able to perform [her] job," but was nonetheless "rejected" solely because Workplace Health had recommended what to MGH was a mystery "medical hold," on Lane; MGH viewed Lane as capable but dispensable because of unfounded "fears," disguised by an already-broken policy, that Lane was somehow medically unworthy to continue her employment. *Cf. Daugherty*, 544 F.3d at 703.

To make the evidence worse for MGH, after termination, MGH offered Lane her position back without any conditions, medical examinations, or further inquiry. She declined the invitation and no longer wants to work at MGH.

In the absence of any disputed material facts, the EEOC, proceeding as the Plaintiff in this case, is entitled to summary judgment as to liability under the ADA, and this matter will proceed to a jury trial for a damages determination.

## I.    BACKGROUND

Defendant MGH is a federally qualified health center that provides, among other things, medical services, dental services, behavioral health services, and maternal infant health services. (ECF No. 36-1 at PageID.559–60.)

Pursuant to the Affordable Care Act, MGH created an outreach and enrollment coordinator position: a grant-funded position tasked with enrolling people in the federal health-insurance marketplace, and conducting community outreach. (*Id.* at PageID.563.)

Plaintiff Avis Lane applied for the enrollment coordinator position at some point in the summer of 2013. When Lane applied, she signed a form stating she understood that if she received "a conditional offer of employment," MGH "*may*" require her to submit to a physical examination. (ECF No. 34-6 at PageID.378 (emphasis added); *see id.* at PageID.379

(emphasis added) ("Q: So, would it be fair that you understood *if* Muskegon Family Care offered you a *conditional offer* of employment you might have to submit to a physical or medical examination including drug testing; is that fair? [Lane:] Yes.").)

In that vein, MGH had a policy of mandating post-offer, "pre-employment" physicals. (*See* ECF No. 34-14 at PageID.443 ("Ensure satisfactory completion of the physical exam prior to hiring and assigning duties.").) A candidate was supposed to "pass all . . . post-offer requirements," including the "post-offer physical," before "new hire orientation." (ECF Nos. 34-4 at PageID.355; 34-14 at PageID.443.)

However, with Lane, "the process was a little different" because Human Resources staff "were notified that she needed to start on September 10th," in a very short timeframe. (ECF No. 36-1 at PageID.558.) Thus, on September 6, 2013, MGH offered Plaintiff Avis Lane the outreach and enrollment coordinator position. (ECF Nos. 34-4 at PageID.357; 34-13 at PageID.441.) The only offer of employment that has been submitted to this Court demonstrates that an *unconditional* offer was made in writing.[1]

---

[1] The parties both seem to assume that passing the medical examination was a condition of employment based upon a consent form that Lane signed when initially submitting an application; however, the *actual* offer extended to Lane shows that passing the medical examination was no longer a pre-condition, at least as of September 6, 2013. The fact that MGH broke its own policies with respect to conditional hires does not inure to its benefit. If "an applicant is not . . . medically cleared by Workplace Health," the next course of action is to "withdraw the conditional offer of employment," i.e., before the employee assumed any work responsibilities. (*See* ECF No. 34-4 at PageID.357.) Ample evidence exists in the record to establish that Lane was, as a legal matter, an unconditional employee. The Court understands that it must view the facts in the light most favorable to MGH on the EEOC's motion, but MGH's argument that Lane was somehow still a conditional hire does not enjoy any *actual* support in the record. The fact that Lane signed a form which stated a condition "if" she was extended a conditional offer simply does not matter. The offer letter itself does not contain any conditions. And MGH officials viewed Lane as an employee who they attempted to "retain," but ultimately "terminated" her.

Dear Avis,

I am pleased to confirm the offer of employment made to you as an Outreach/Enrollment Coordinator at Muskegon Family Care. This position is full-time/temporary and is currently grant-funded.

This position is offered at a base rate of $18.00 per hour, subject to deductions for taxes and other withholdings as required by law and Muskegon Family Care policy. Employment with Muskegon Family Care is at-will and either party may terminate the employment relationship at any time with or without cause, or with or without notice.

Please let me know if I can be of any further assistance to you. We are looking forward to your employment with Muskegon Family Care!

Sincerely,

Emmitt M. Davis, PHR
Human Resources Director

(ECF No. 34-13 at PageID.441.) Indeed, Davis testified that Lane was "hired September 10, 2013," without mentioning any conditions. (ECF No. 34-4 at PageID.358.) Other MGH officials confirmed their understanding that Avis Lane was an employee during the relevant time period. MGH allowed Lane to attend new hire orientation and "to continue working"—even after a physical examination—because it was "making some attempts . . . *to retain her as an employee.*" (ECF No. 34-4 at PageID.368 (emphasis added).)

Accordingly, even the record in the light most favorable to MGH demonstrates that Lane began her actual employment with MGH on September 10, 2013. (ECF No. 36-1 at PageID.557–58); *see supra* note 1. Certainly, MGH's normal policies would have made her a conditional hire; however, Lane was an employee and not merely a conditional hire

5

because: a) MGH's normal policies were not followed (*see, e.g.*, ECF No. 34-14 at PageID.443; ECF No. 36-1 at PageID.558); b) the undisputed factual record establishes that she was an active employee performing duties as assigned during the relevant time period (*see, e.g.*, ECF No. 34-4 at PageID.368; ECF No. 34-13 at PageID.441); and c) the relevant law provides that while an employer "may require a[n] [employee entrance] examination after an offer of employment has been made to a job applicant"—"and may *condition an offer of employment* on the results of such examination"—the examination must occur "prior to the commencement of the employment duties of such applicant," *see* 42 U.S.C. § 12112(d)(3) (emphasis added); and thus, MGH may not rely on a misclassified health examination as the sole reason to argue the offer was conditional.[2] *See infra* note 10.

Notwithstanding MGH's offer letter to Lane, which prompted Lane to begin work on September 10, 2013, MGH informed Lane that she needed to report to Workplace Health for a physical, presumably because that was otherwise the normal process. (ECF No. 36-1 at PageID.558–59.)

During the physical, a Workplace Health Physician Assistant, Peter Fries, found no signs during Lane's examination that suggested she could not perform her job duties. (*See* ECF No. 34-2 at PageID.330.) Nonetheless, because Lane's medical records showed she had suffered migraines and thoracic outlet syndrome (TOS) from injuries sustained in a car accident—and was prescribed medications for those conditions—Fries recommended Workplace Health place Lane on a "medical hold." (*Id.* at PageID.330.) Fries did not,

---

[2] Ultimately, whether or not Lane was a conditional hire or employee is not necessarily a material fact on the EEOC's motion for summary judgment. However, it is still important to accurately frame the factual record.

however, realize that Lane had already been assigned work duties, because the normal protocol gave him the ability to recommend that MGH "hold" a conditional hire from beginning work duties, pending the completion of further evaluation. (ECF No. 37-7 at PageID.855.)

The deposition transcript contains the following exchange:

Q: So everything you inspected on Ms. Lane you noted that it was normal and not abnormal?
A: Yes, sir.
Q: And then at some point you also reviewed her vital signs?
A: Yes, sir.
Q: But you didn't note anything in the Positive Findings/Patient Recommendations regarding her vital signs; is that correct?
A: Correct.
Q: And then on page 4 of the evaluation where you make your recommendation, you recommended medical hold pending further data; is that correct?
A: Yes, sir.
Q: And what was that? Why did you make that recommendation?
A: Based upon her history and narcotic pain medication used, multiple muscle relaxers, anti[-]inflammatories and Lidoderm patch.
Q: Sorry, what did you just state about the medications? Anti[-]inflammatory, Lidoderm patch?
A: Muscle relaxers.
Q: Muscle relaxers?
A: Narcotic pain medication. She's also on Neurontin, which is a drug given for nerve-related pain.
Q: So your physical evaluation of her which we just discussed where you checked normal for all the various parts of her body that you examined, that didn't have any impact on your medical hold recommendation?
A: No.
Q: And similarly, nothing about her vital signs caused you to place her on a medical hold?
A: No.
Q: Anything else besides her medical history and the medication?

> A: Correct.
> Q: Excuse me, if you already testified to this, what about the medical history? Was it the car accident?
> A: It was her ongoing complaints with the headaches, headaches and neck injury.
> **Q: And why would the medical history of the headaches and the neck injury and then the medications for anti[-]inflammatory, the Lidoderm, the muscle relaxers, the narcotic pain medication and the Neurontin, why would those cause you to place Avis Lane on a medical hold?**
> **A: Well, it indicates that she is having some degree of pain and certainly taking this much medication *raises a suspector of a cognitive problem at work.***

(*Id.* at PageID.330–31 (emphasis added).)

Curiously, Fries did not even know what the essential functions of the coordinator position were on September 10 when he recommended the medical hold because he did not receive the job description until two days later. (*Id.*; ECF Nos. 34-2; 34-18; 34-19.) Instead, Fries simply asserted, among other things, "a suspector of a cognitive problem at work," and was concerned about Dr. Kapteyn's records, which "indicated that the patient had been seen recently for neck injury sustained in a motor vehicle accident and that she was having ongoing complaints of whiplash, persistent myofascial pain in the neck and shoulder and thoracic outlet syndrome." (ECF No. 34-2 at PageID.332.)

However, Dr. Kapetyn's records also had indicated Lane passed the MRI, CT, and EMG examinations. On July 25, 2013, Dr. Kapteyn even notes: "There is no mechanical underlying issue that would preclude her, it appears, from doing her work." (ECF No. 34-17 at PageID.462.)[3]

---

[3] Fries' reliance on Dr. Kapetyn's records as the sole basis for the medical hold is problematic because Dr. Kapetyn himself concluded that nothing precluded Lane from doing her work. (*Id.*)

Regardless, after receiving the job description, Fries recommended that Lane undergo a functional capacity evaluation (FCE). According to Fries, an FCE is "a performance-based test that is performed by a physical therapist to determine whether an individual may perform the essential functions based upon the job description." (ECF No. 34-2 at PageID.329.) The first job description indicated that Lane's position would require her to regularly "sit, walk, reach, stand, stoop, kneel, crouch or crawl and occasionally lift or move up to 50 pounds with frequently lifting or moving up to 25 pounds." (*Id.* at PageID.334.)

On September 24, two weeks after Lane began working, Bridges and Russ confronted Lane regarding Workplace Health's recommendation for a medical hold and an FCE. This was the first time that Lane was notified of any issues resulting from the medical examination.

During this meeting, Lane offered to pay for the FCE out of her own pocket. (ECF Nos. 34-6 at PageID.385; 34-3 at PageID.349; 34-21 at PageID.480.) Russ and Bridges then stated the FCE was expensive. (ECF No. 34-21 at PageID.480.) In that context, it was suggested that Lane obtain a release from Margaret Wolter, a Nurse Practitioner and her primary care provider. (*Id.*)

Lane produced a note from Wolter the next morning. (ECF No. 34-6 at PageID.386.) The note stated that Lane could "work full-time without any restrictions." (ECF No. 34-7 at PageID.397.) As Lane's primary care provider, Wolter was well-versed in Lane's medical condition in 2013. (*See id.*; ECF No. 34-16 at PageID.453.) Wolter wrote the note based upon her personal knowledge of Lane's condition. (ECF No. 34-16.) No one from MGH or Workplace Health followed up with Wolter. (ECF No. 37-9 at PageID.865.)

After Lane produced the note, she was not contacted by MGH again until termination; thus, she thought that any outstanding medical issues were resolved when she submitted the note giving her full clearance. (ECF No. 34-6 at PageID.387.)

Despite Wolter's note, MGH still relied on the recommendation from Workplace Health because MGH relies solely on Workplace Health's recommendation whether someone is physically qualified. (ECF No. 37-2 at PageID.772 (Q: Why did you not allow Ms. Lane to continue working at Muskegon Family Care based on Ms. Wolter's letter? [Bridges:] Because it's not the provider who has to give the final clearance. Workplace Health has to give the clearance for someone to work at Muskegon Family Care.").)

MGH faxed Wolter's note to Workplace Health on September 26 to see if they would now release Lane to work. (ECF Nos. 37-2 at PageID.773; 37-7 at PageID.851.) Fries reviewed the note on October 1. (ECF No. 37-7 at PageID.851.) Despite the note, Fries still recommended MGH place Lane on a medical hold pending an FCE because of the physical demands of the job. (*Id.* at PageID.852.)

Because Fries still recommended the medical hold, Bridges amended the coordinator job description to lower the lifting requirement to 25 pounds from 50 pounds. (ECF Nos. 37-2 at PageID.775; 37-7 at PageID.853.) Workplace Health *still* recommended the hold after receiving the amended job description (ECF No. 37-7 at PageID.853.) Russ called Fries about the amended job description. During this call, Fries asked Russ, "do you know what medications she is on daily?" (ECF No. 34-21 at PageID.480.)

Lane did not need and never requested an accommodation to perform the coordinator's functions during the five-week period she worked for MGH. (ECF No. 34-6

at PageID.389.) Yet even after Fries knew that Lane had worked for five weeks in the position without a single request for an accommodation, he would not change his recommendation. (ECF No. 37-7 at PageID.854.) Fries explained that he "still felt [Workplace Health] needed objective data to determine whether or not she could perform the essential functions of the job." (*Id.* at PageID.855.) When asked why a five-week successful work history did not provide objective evidence to support Lane's ability to work, Fries averred that he was still "uncertain whether or not she would be able to perform the essential functions of the job without having an aggravation of her preexisting condition." (ECF No. 34-2 at PageID.339.)

In response to Workplace Health's inflexibility, Davis and Bridges then inexplicably decided to terminate Lane solely because of Workplace Health's recommendation for a medical hold. (ECF No. 34-4 at PageID.363 ("She was terminated based upon discovery of the fact that she wasn't cleared to work by Workplace Health.").) Of course, because Lane had been working and MGH broke its own normal policies, Lane was not then on a "medical hold." (*See id.*; ECF Nos. 34-4 at PageID.355; 34-14 at PageID.443; 36-1 at PageID.558.) Rather, the "medical hold" essentially operated as a recommendation by Workplace Health (who did not know Lane had been working) that Lane pass an FCE prior to working.

Indeed, the fact that MGH later offered Lane her position back without any conditions proves that MGH enjoyed plenary authority all along to disregard Workplace Health's determinations. (*See* ECF No. 33 at PageID.115.)

On October 15, at Davis' and Bridges' direction, Russ and Rayvene Bell, another HR Coordinator, told Lane that MGH was terminating her because she did not "pass" the post-offer physical. (ECF Nos. 34-12 at PageID.439; 34-4 at PageID.358; 34-9 at PageID.409.)

11

Even knowing that Lane had offered to pay for the FCE—and never retracted that offer—MGH did not give Lane any opportunity to pay and undergo the examination. (ECF No. 34-12 at PageID.439.)

## II.   LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. The function of the district court "is not to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson,* 477 U.S. at 249).

### III.   ANALYSIS

"To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016).

"If there is direct evidence that the plaintiff suffered an adverse employment action because of his or her disability, the plaintiff then 'bears the burden of establishing that he or she is 'disabled' and 'otherwise qualified for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation.'" *Ferrari*, 826 F.3d at 891 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). *But see* 42 U.S.C. § 12201(h) (noting that an employer "need not provide a reasonable accommodation . . . to an individual who is only 'regarded as' disabled").

Here, there is undisputed "direct evidence" that MGH terminated Lane because it (through Workplace Health) determined Lane was not medically cleared for the position, but it did so prior to the completion of an individualized determination and chose to disregard other objective evidence indicating Lane was qualified to perform her essential job

functions. Indeed, Lane performed all the duties of her position for over five weeks successfully, and without a single incident.

Since MGH disputes its liability on several fronts. The Court will address each element in turn.

### 1.    MGH (through its relationship with Workplace Health) regarded Lane as disabled.

Under the ADA, "[t]he term 'disability' means, with respect to an individual— (A) a physical or mental impairment that substantially limits one or more major activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

"An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).[1]

Courts must also be mindful that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

As the Court will demonstrate below, MGH, through Workplace Health, regarded Lane as disabled. One initial hurdle exists, however, relating to statutory interpretation.

---

[1] Paragraph (1)(C), however, does "not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12101(3)(B).

### a.   *The statutory language is unambiguous and controls.*

The plain text of the statute, as amended in the 2008 ADA Amendments Act, clarifies that an individual need not show an employer perceived an impairment as substantially limiting. *See* 29 C.F.R. § 1640.2(1) ("This provision is designed to restore Congress's intent to allow individuals to establish coverage under the 'regarded as' prong by showing that they were treated adversely because of an impairment, without having to establish the covered entity's beliefs concerning the severity of the impairment.").[5]

Recently, in *Ferrari*, 826 F.3d at 885, the Sixth Circuit cited to two pre-Amendments Act cases, *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) and *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661 (6th Cir. 2008), for the proposition that a plaintiff must "specify which 'major life activity' [the Defendant] believed was limited by [an impairment]." *Ferrari*, 826 F.3d at 893. Both *Daugherty* and *Gruener* relied on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), which was superseded by the ADA Amendments Act. *See Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016) (noting "the 2008 amendments codified in the ADAAA made the ADA's definition of being 'regarded as' having an impairment substantively broader than that definition had been in the period after *Sutton*").

That requirement, at least applied to this case, turns the amended statutory language on its head because an individual must now merely establish "that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment <u>whether or not the impairment limits or is perceived to limit</u>

---

[5] "To illustrate how straightforward application of the 'regarded as' prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability." 29 C.F.R. § 1630.

*a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added); *compare id. with Ferrari*, 826 F.3d at 893 (quoting *Gruener*, 510 F.3d at 664) ("Individuals may be regarded as disabled when (1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities."); *see also* 29 C.F.R. § 1630.2 ("[E]valuation of coverage can be made solely under the 'regarded as' prong of the definition of disability, which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.").

The new, post-Amendments Act regulations, for example, "illustrate how straightforward application of the 'regarded as' prong is[:] if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability." 29 C.F.R. § 1630 App. Nothing more would be required. *See* 42 U.S.C. § 12102(3)(A).

The statute plainly states that "major life activity" definitions are not relevant to the question of whether an individual "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment." *See id.*

The Court is uncertain why *Ferrari* cited pre-Amendments Act cases for a principle of law that no longer applies—and this Court of course will not second guess the Sixth Circuit's application to that case; but as to this case, the amended statutory language must control because "courts must presume that a legislature says in a statute what it means and

16

means in a statute what it says there." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461–62 (2002).

Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)); *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'").

The Court does not take its task of interpreting this section lightly, particularly in light of *Ferrari*, 826 F.3d at 885, which otherwise lays out other legal standards in a cogent manner. However, this is not a situation where this Court merely disagrees with a higher court on an interpretation of a statute. Rather, this Court interprets the amended statute as written and controlling, *Barnhart*, 534 U.S. at 462, over case law that has been directly superseded by the Amendments Act and no longer is binding on the precise point at issue. *See, e.g.,* *Mercado*, 814 F.3d at 588 ("After the enactment of the ADAAA, however, a plaintiff bringing a 'regarded as' claim under the ADA needs to plead and prove only that she was regarded as having a physical or mental impairment. Such a plaintiff no longer needs to plead and prove that such impairment substantially limited one or more major life activities."); *see also* *Milholland v. Sumner Cty. Bd. of Educ.*, 569 F.3d 562, 566 (6th Cir. 2009) (noting that "[t]he amended version of the ADA no longer requires the plaintiff bringing a claim under subpart

(C) to show that the impairment limited her life activity" but holding that "the ADA Amendments Act does not apply to pre-amendment conduct" in that case).

> **b.** **_The factual record in the light most favorable to MGH demonstrates that Lane had at least a perceived impairment, MGH regarded Lane as having an impairment, and therefore, MGH regarded her as disabled._**

The record is clear: Workplace Health, and thus MGH, regarded Lane as having an impairment under the ADA, and MGH ultimately determined she was unfit to continue to perform her job responsibilities, at least in the absence of undergoing further medical testing. Hence, Workplace Health recommended that MGH place a "medical hold" on Lane until an FCE could be performed, and in response, MGH inexplicably terminated her.

> **i.** *Lane had at least one perceived impairment.*

"An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

A "physical or mental impairment" is simply:

> [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lyphathic, skin, and endocrine; or (2) [a]ny mental or psychological disorder, such as an intellectual disability . . ., organic brain syndrome, emotional or mental illness; and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1)–(2).

Paragraph (1)(C), however, does "not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12101(3)(B).

Here, there is no dispute in material fact that during the relevant time period, Lane suffered: a) severe migraines, and b) thoracic outlet syndrome, both of which Workplace Health considered as "impairments" because of the perceived effects of those conditions on Lane's neurological system, *see* 29 C.F.R. § 1630.2(h)(1), and neither of which were "transitory and minor." *See* 42 U.S.C. § 12101(3)(B).[6]

With respect to Lane's migraines and thoracic outlet syndrome, Peter Fries, the Physician Assistant, along with his supervisor, Dr. Charles Feldt, relied on these conditions documented in Lane's medical records to recommend that Lane be placed on a "medical hold," pending a functional capacity evaluation. (*See* ECF No. 34-2 at PageID.331.) Fries testified that the "headaches and neck injury," along with certain medications, "indicate[d] [Lane] is having some degree of pain." (*Id.*) But he went a step further, testifying that in his mind, her conditions and medication **"raise[d] a suspector of a cognitive problem at work."** (*Id.*) Fries's supervising doctor, Dr. Charles Feldt, "agreed" with Fries's recommendation that Lane be placed on a medical hold after a "five- to ten- minute meeting." (*Id.* at PageID.338.)

Even after receiving Lane's treating physician's clearance and being informed that Lane had successfully worked in the position for five weeks without accommodation, Fries

---

[6] Lane had a history of both conditions dating back to injuries she suffered in a car accident. (*See* ECF No. 34-6 at PageID.382.) And MGH does not argue that any impairment was "transitory and minor."

refused to change the hold recommendation "[b]ecause [he] was uncertain whether or not she would be able to perform the essential functions of the job without having an aggravation of her preexisting condition." (*Id.* at PageID.339.) Thus, even in light of further evidence, Workplace Health still perceived Lane as having an impairment.

MGH also perceived Lane as having an impairment, based upon its mechanical reliance on Workplace Health's assessment, as the Court will demonstrate below.

> *ii.*     *MGH cannot escape liability by insulating itself from Workplace Health's assessment because MGH adopted Workplace Health's (inconclusive) recommendation as the sole basis for termination, and thus, MGH regarded Lane as having an impairment.*

MGH first seeks to distance itself from Workplace Health's position by arguing that "MGH's decision-makers" did not "kn[o]w anything about Lane's medical condition," and therefore, "Workplace Health's knowledge of Lane's medical condition cannot be imputed to MGH in this case."

In advancing its alleged "lack of knowledge" as an argument, MGH ignored 42 U.S.C. § 12112(b)(2), 29 C.F.R. § 1630.6, and other relevant case law, such as *Keith v. Cty. of Oakland*, 703 F.3d 918 (6th Cir. 2013),[7] from its initial briefing. Regretfully, MGH does not cite to, or attempt to distinguish from, binding authorities that contradict their position. *See* Fed. R. Civ. P. 11(b).

---

[7] "Because it strikes us as incongruent with the underlying objective of the ADA for an employer to make an individualized inquiry only to defer to the opinions and advice of those who have not, we direct the district court to consider these questions on remand. *See Holiday*, 206 F.3d at 645 (reasoning that employers cannot escape liability under the ADA merely be mechanically relying on the medical opinions and advice of third parties)." *Id.* at 924.

Section 12112(b)(2) of the ADA states: "the term 'discriminate against a qualified individual on the basis of disability' includes . . . participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter . . . ." That section plainly applies here, just as it did in *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000) (quoting 42 U.S.C. § 12112(b)(2)).

Simply put, "[e]mployers do not escape their legal obligations under the ADA by contracting out certain hiring and personnel functions to third parties." *Holiday*, 206 F.3d at 645. Rather, again, "[a]s a threshold matter, '[t]he ADA mandates an individualized inquiry in determining whether an [applicant's] disability or other condition disqualifies him from a particular position." *Keith*, 703 F.3d at 923 (citing *Holiday*, 206 F.3d at 643).

Admittedly, in both *Holiday* and *Keith*, the medical professionals did not undertake a sufficient individualized inquiry. Here, by contrast, Workplace Health's providers initially took steps to individually evaluate Lane's ability to perform the essential functions of the position, and there is no evidence of reliance on unfounded stereotypes, such as the doctors did in *Holiday* (AIDS) and *Keith* (deafness).

However, in this case, MGH truncated the process, and in many ways, did not even follow Workplace Health's advice. Workplace Health "could not determine whether Lane could meet the physical demands of her position without an FCE." (ECF No. 44 at PageID.1026.) In other words, Workplace Health did not conclude she was unable to perform the essential functions of her job—but MGH essentially did by short-circuiting the individualized process, which presents the primary problem for MGH in this case. (*See, e.g.,*

21

ECF No. 34-3 at PageID.351 (emphasis added) (Q: "Are you making a distinction between not meeting criteria and termination? [Cora Russ:] Well, it's kind of the same **because of the simple fact [Lane] could not perform the duties of the job** based on the job description because of the release—because of no release because of Workplace Health.").

How MGH could rely on a "reasonable medical judgment" when that medical judgment had not even been passed, it does not explain. (*See id.*)

What is undisputed, though, is that Workplace Health did not terminate Lane. *MGH* did so despite being free to pay for the FCE, approach Lane again to ask her to pay for the FCE, as she had previously offered, or simply disregard the recommendation based upon other overwhelming evidence showing Lane was qualified.

While MGH's decision-makers may not have known all of the medical details,[8] they certainly knew that their medical recommenders regarded Lane as not yet medically cleared for work, and thus perceived her as having an impairment of some kind. *See* 29 C.F.R. § 1630.2(h)(1)–(2); (*see also* ECF No. 34-3 at PageID.350 (noting Physician Assistant Peter Fries asked Cora Russ, a Human Resources Specialist, "do you know the medications she is on daily?")). And MGH indisputably terminated Lane by relying solely on Workplace Health's recommendation, rather than performing its own individualized inquiry. The Human Resources Director, Emmitt Davis, testified:

> Q: So why was Avis Lane subsequently terminated?
> A: She was terminated based upon discovery of the fact that she wasn't cleared to work by Workplace Health.

---

[8] Indeed, that is probably with good reason; the law prohibits detailed disclosures and allows for only a few narrow disclosure exceptions. *See, e.g.,* 42 U.S.C. § 12112(d)(3)(B)(i) ("[S]upervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations.").

Q: So the medical hold?
A: Yes.
. . . .
Q: Were there any other reasons for the termination?
A: No.

(ECF No. 34-4 at PageID.363.)

An employer cannot have it both ways; if it delegates the individualized inquiry to a third party, it cannot then insulate itself by claiming no "knowledge" of a person's impairment or "responsibility" for the recommendation that it adopted. It's stuck with the inquiry that was done(—or in this case, not completely done).

If MGH's position won the day, all employers could simply contract out disability determinations to a third-party medical provider and simply be immune once they "mechanically rel[ied] on the medical opinions and advice of third parties," even if the medical opinions were objectively unreasonable, *Keith*, 703 F.3d at 924 (citing *Holiday*, 206 F.3d at 645), or as in this case, not even complete. *But cf. Ferrari*, 826 F.3d at 897 (noting that in claims advanced under the "indirect method," an employer may rely on the "honest belief rule with regard to pretext," and finding that the decision-makers honestly believed a doctor's "imposed restrictions" were reasonable).[9]

A final note. MGH chose not to follow its own policies with respect to affirming medical clearance prior to Lane being assigned employment duties; thus, to determine

---

[9] Every other case MGH cites to for the proposition that the "decision-maker" needs to have knowledge of a plaintiff's disability was one with indirect evidence of disability discrimination, with other proffered reasons for adverse actions. *See, e.g., Webb v. Mercy Hosp.*, 102 F.3d 958, 959–60 (8th Cir. 1996) (relying on pre-Amendments Act statutory definition for "regarded as" claim and noting that plaintiff had produced "no evidence that her supervisors or the management . . . were aware of the [depression] diagnosis" to refute the employer's proffered reason for the adverse action, "disruptive and insubordinate behavior"). This case is a different species altogether.

whether Lane could continue working, MGH transformed what would have been, *at best*, a "continuation" of an "employment entrance examination" into a forbidden employment examination.[10]

### 2. Lane was "otherwise qualified" for her position.

The EEOC has already carried its "burden of establishing that [Avis Lane] [w]as 'disabled'" under the statute because MGH regarded Lane as disabled.

---

[10] MGH decided it did not want to pay for the FCE, and *terminated* Lane, a current employee, because Workplace Health would not change its recommendation for a medical hold without the FCE. That makes MGH's conduct here even more egregious because under the ADA, "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity," 42 U.S.C. § 12112(d)(4), and any action to the contrary constitutes "discrimination as referred to in subsection (a)." 42 U.S.C. § 12112(d)(1); *see* 29 C.F.R. § 1614(b)(2) ("The results of such [medical] examination shall not be used for any purpose inconsistent with [the ADA].").

In addition, even assuming only for the sake of argument that Lane was a conditional hire subject to an examination under 42 U.S.C. § 12112(d)(3) and MGH had followed its own policies, MGH and Workplace Health did not require an FCE for "all entering employees in the same job category . . . regardless of disability." 29 C.F.R. § 1630.14(b). In fact, the additional inquiry or examination was ordered precisely *because of* Lane's perceived disability. An FCE is an examination separate and apart from an initial medical examination, as even Workplace Health's employees admit.

And MGH apparently subjects only those prospective employees who Workplace Health perceives as being impaired in some way to a separate, costly FCE. A policy of refusing to hire only employees suspected of having disabilities who will not pay for a specialized examination that runs nearly $1,000.00 seems to violate the plain language of the statute. *See* 42 U.S.C. § 12112(d)(3) ("A covered entity may require a medical examination . . . and may condition an offer of employment on the results of such examination, if . . . *all entering employees are subjected to such an examination regardless of disability*."). If that policy continues to hold true, MGH is essentially sending a forbidden signal: "Impaired individuals need not apply." Indeed, *even if* Lane had failed an FCE, MGH would have been required to provide "necessary accommodations." *See id.* § 12112(3)(B)(i). Simply refusing to hire a person without resorting to the "interactive process" can itself constitute a violation of the ADA. *See, e.g., Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d. Cir. 1999). So even assuming MGH can require an FCE and pass along those costs to a prospective employee, the examination results may only be one step in that "interactive process" to determine whether an an employee is qualified to perform the essential functions of a position with or without accommodation or by eliminating an essential function.

The Court ultimately finds, however, that the EEOC did not adequately plead or develop argumentation that MGH and Workplace Health requiring Lane to take (and pay for) the FCE itself constituted unlawful discrimination in this vein.

The only remaining question,[11] then, is whether Lane "otherwise qualified for the position despite . . . her [impairments]: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation." *Ferrari*, 826 F.3d at 891 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). However, because the EEOC has moved for summary judgment under a "regarded as" disabled theory, the employer is presumed to have no obligation to provide any reasonable accommodation. *See* 42 U.S.C. § 12201(h) (noting that an employer "need not provide a reasonable accommodation . . . to an individual who is only 'regarded as' disabled"). Thus, the question is simply whether Lane "otherwise qualified for the position." *See Ferrari*, 826 F.3d at 891.

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252.

However, in a direct evidence case, if an employer takes an adverse action against an employee because of a perceived impairment prior to completing an individualized inquiry to see whether the employee may continue to perform the essential functions of her position, the employer is estopped from arguing that the employee was not otherwise qualified after the fact.

---

[11] MGH fired Lane because of her medical condition, as the Court will demonstrate below.

And even if MGH should not be estopped as a matter of law, the evidence here is indeed "so one-sided that [the EEOC] must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The factual record in the light most favorable to MGH has not put forth sufficient evidence in the record to refute the EEOC's evidence that Lane "otherwise qualified" for the position despite her impairments without future accommodation.

      a.  *Since the factual record in the light most favorable to MGH demonstrates that MGH (through Workplace Health) never completed an individualized inquiry prior to terminating Lane on the basis of a perceived disability, MGH is statutorily estopped from arguing that Lane, a current employee, was not "otherwise qualified."*

"The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n).

MGH does not dispute that Lane satisfied the "requisite skill, experience, [and] education . . . requirements of the employment position." *Id.* Rather, it argues that a flimsy factual dispute precludes summary judgment in EEOC's favor because Workplace Health's doctors doubted whether Lane could lift twenty-five pounds and had never made a final determination over whether she could perform the essential functions of her position prior to MGH's decision to terminate Lane.

Even though Lane successfully performed every duty assigned to her for nearly five weeks, MGH argues that "Lane did not perform the full range of duties she would have been expected to perform if she remained in the position," because some minimal "lifting was required" during "approximately two or three offsite events per week *after Lane left*." (ECF No. 44 at PageID.1026 (emphasis added).) But that perceived unknown, of course, is not Lane's fault and should not inure to MGH's benefit on summary judgment.

MGH short-circuited the individualized evaluation process by terminating Lane prior to the completion of any final individualized inquiry. This is the rare case where an employer openly admits that it never completed an individualized inquiry(—and remarkably using that fact as a sword to argue that it did not regard her as disabled, *see infra* Part III.2.a.ii).

"The ADA mandates an *individualized inquiry* in determining whether an employee's disability or condition *disqualifies him from a particular position*. In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medication condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Holiday*, 206 F.3d at 643 (emphasis added); *accord. Jones v. Nissan North Am., Inc.*, 438 Fed. App'x 388, 398 (6th Cir. 2011) ("With respect to 'regarded as' discrimination, this court explained in *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000), that an employer is required to conduct an 'individualized inquiry' into the plaintiff's *actual medical condition*."). Indeed, under the ADA, the Sixth Circuit has suggested that the failure to complete an individualized inquiry itself can constitute a standalone violation of the ADA. *See, e.g., Keith*, 703 F.3d at 930 ("On remand, the district court is also directed to address

27

whether Oakland County violated the ADA's individualized inquiry mandate by relying on the advice and opinions of third parties and failed to engage in the interactive process.").

Several courts have encountered fact patterns where an employer, whether relying on an outside resource or not, simply failed to complete an individualized inquiry into whether an employee is qualified to "perform the essential functions of [the] position," 29 C.F.R. § 1630.2. *See, e.g., Jones*, 438 Fed. App'x at 401 (reversing a jury verdict and holding that plaintiff was entitled to judgment as a matter of law because the record definitively established that the employer did not independently assess plaintiff's physical capabilities prior to terminating him); *Lafata v. Dearborn Heights Sch. Dist. No. 7*, No. 13-cv-10755, 2013 WL 6500068, *11 (E.D. Mich. Dec. 11, 2013) (granting employee's motion for summary judgment because "[a] reasonable trier of fact could not find that the [employer] engaged in such an individualized inquiry" and the employer erroneously deferred to a non-treating physician's recommendations).

However, these courts have not fully fleshed out why an employer—notwithstanding the lack of any individualized inquiry—was not entitled to nonetheless prevail on the grounds that its employee could not demonstrate she was "otherwise qualified," *see, e.g., Jones*, 438 Fed. App'x at 401,[12] the second element of a claim under the ADA, *see Ferrari*, 826 F.3d at

---

[12] In *Holiday*, the Sixth Circuit reversed the lower court's order granting summary judgment to the employee because "Dr. Dowlen's report *at most* creates a question of fact as to whether Holiday was qualified to perform the essential functions of the position of police officer." 206 F.3d at 645. However, since the plaintiff had never moved for summary judgment, the Sixth Circuit could not have summarily granted judgment to plaintiff. *See id.* In *Keith*, the Sixth Circuit determined that the employer *did* perform an indivualized inquiry, but nonetheless refused to hire an applicant, leaving factual disputes. The Court noted, "That being the case, we question what changed?" 703 F.3d at 924. Thus, both cases actually had factual disputes with respect to whether the employer had completed sufficient individualized inquiries, which meant that there were also factual disputes with respect to whether the individual was "otherwise qualified." By contrast, here, MGH

28

891 ("To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability.").

The Court is convinced that the appropriate reason why MGH cannot prevail on the "otherwise qualified" element is that in a direct evidence case advancing a "regarded as" disabled claim, when there is no genuine issue of material fact that an employer failed to complete an individualized inquiry, the employer is statutorily estopped from arguing that an employee is "not otherwise qualified" for the position because it terminated that employee prior to the completion of the inquiry.

In *Holiday*, the Sixth Circuit made clear that "[t]he ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." 206 F.3d at 643; *accord. Keith*, 703 F.3d at 923 (noting that the individualized inquiry is a "threshold" one).

In *Holiday*, however, only the employer had moved for summary judgment. Thus, the Sixth Circuit was confined to concluding that "Holiday ha[d] presented sufficient evidence that would allow a jury to conclude that Dr. Dowlen failed to undertake the individualized determination that the ADA requires and instead disqualified Holiday because of his HIV status without any indication that Holiday's condition actually impeded his ability to perform as a police officer." *Id.* at 644. Thus, the panel concluded that "under

---

admits that an individualized inquiry was never complete. That makes this case much closer to the facts in *Jones* with respect to the "otherwise qualified" element of an ADA claim.

these circumstances, Dr. Dowlen's report *at most* creates a question of fact as to whether Holiday was qualified to perform the essential functions of the position of police officer." *Id.* (emphasis added).

By contrast, in *Jones*, the Sixth Circuit took the rare step of reversing a jury verdict and ordering judgment be entered in an employee's favor because since there was no genuine issue of material fact that the employer did not complete an individualized inquiry, it was essentially estopped from asserting an honest-belief defense. *See* 438 Fed. App'x at 401–02. The failure to perform an individualized inquiry, in other words, was fatal to the employer.

The facts in this case are, in some ways, more egregious than in other cases. While the employers themselves merely relied on (final) medical recommendations in *Holiday* and *Keith*, albeit erroneously, MGH here relied on what was merely a recommendation for a deeper individualized inquiry as the sole basis to terminate Lane.

At bottom, if MGH were allowed to proceed to trial and avoid liability prior to completing its individualized inquiry by "terminating now" and "arguing she was not otherwise qualified anyways later," the very thesis of the ADA would be undermined. *See Smith v. Chrysler*, 155 F.3d 799, 805 (6th Cir. 1998) (quoting 136 Cong. Rec. S 7422-03, 7347 (daily ed. June 6, 1990) (statement of Sen. Harkin)) (alteration in original) ("The thesis of the [ADA] is simply this: That people with disability ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have.'"); *accord. Holiday*, 206 F.3d at 643.

Even assuming that the failure to perform an individualized inquiry prior to taking an adverse action on an employee was not a per se violation of the ADA, MGH could not prevail at trial on the question of whether Lane was "otherwise qualified" for the position.

**b. *Even if MGH was not statutorily estopped from arguing Lane was not "otherwise qualified," no reasonable trier of fact would conclude Lane was not "otherwise qualified" for her position, in part because MGH would be judicially estopped from arguing that she was not qualified.***

As an initial matter, in a textbook case of "regarded as" disabled discrimination under the ADA, there typically is no dispute that either the employee was "otherwise qualified" or the employer took the adverse action prior to making an individualized determination. If an employee who is terminated is not otherwise qualified, she usually, but not always, has a substantially limiting life activity under the statute, and thus an actual disability, and not merely being regarded as having one.

Hypothetically, if the functional capacity evaluation had been administered, and if Workplace Health made a determination that Lane could not perform all essential functions of the (mainly sedentary) position, Lane almost certainly would have met the definition of a current employee with an actual disability (with one of several possibilities constituting the substantially limiting life activity). *Compare* (ECF No. 34-2 at PageID.334 ("Q: So did you feel that because she was taking those medications, she might not be able to stand, walk, reach with her hands and arms, stoop, kneel, crawl or crouch and perform the lifting requirements as reflected in that paragraph? A: That is correct or she might further injure herself.")) *with* 42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include, but are not limited

to . . . performing manual tasks, . . . standing, lifting, bending . . . [and] concentrating, thinking . . . and working.").

That would mean that MGH would have been required to "engage in the interactive process," which is "mandatory and 'requires communication and good-faith exploration of possible accommodations.'" *Keith*, 703 F.3d at 929; *cf.* 42 U.S.C. § 12201(h) (noting that an employer "need not provide a reasonable accommodation . . . to an individual who is only 'regarded as' disabled," but obviously must do so if the employee is actually disabled). *See supra* note 10. But MGH short-circuited the entire ADA process by terminating her before it even knew whether she could (continue her) work without an accommodation, let alone with one.

At most, putting aside statutory estoppel, the EEOC could argue at trial that it, through Workplace Health, *had not yet determined* whether Lane was "otherwise qualified," and therefore, the EEOC could not prove by a preponderance of the evidence that she was "otherwise qualified" for the position.

To defeat summary judgment, MGH has argued that the fact that Workplace Health never finished its individualized inquiry proves that neither MGH nor Workplace Health regarded Lane as disabled. At trial, MGH could not then change course and argue that Lane was not, in fact, otherwise qualified for the position because the Court would judicially estop MGH from doing so. *See* 18B C. Wright, A. Miller, and E. Cooper, Federal Practice and Procedure § 4477 (2d ed. 2002) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."); *cf. New Hampshire v. Maine*, 532 U.S.

32

742, 749 (2001) ("[J]udicial estoppel[] 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.")

Moreover, even putting aside statutory and judicial estoppel, the idea that a jury would somehow conclude that Lane was not qualified to work in the coordinator position seems fantastical. The evidence is overwhelming that Lane "otherwise qualified" for the position she performed successfully for five weeks without a single incident.

In *Holiday*, the record was "replete with factual evidence available to the [defendant] at the time—particularly [plaintiff's] successful performance of police jobs that [the doctor] claimed he was unqualified to do—that flatly contradicted [the doctor's] unsubstantiated conclusion." *Holiday*, 206 F.3d at 646. "Under these facts," the Sixth Circuit held, "the [defendant] was not entitled to simply rely on the physician's recommendation as the basis for withdrawing its employment offer to [the plaintiff]." *Id.* Similarly, in *Keith*, while the employer initially appeared to perform an individualized inquiry, it ironically appeared to then defer to medical providers who had not performed an individualized inquiry. *See Keith*, 703 F.3d at 924.[13]

---

[13] Admittedly, this case also has some factual dissimilarities from *Keith* and *Holiday*. This case, for example, encompasses a different adverse action (termination) than *Holiday* (withdrawing an employment offer) and *Keith* (refusing to hire an employee). Lane became an employee on September 10, when MGH assigned her work duties before it had even received a recommendation from Workplace Health for a functional capacity evaluation. *See* 29 C.F.R. § 1630.14(b) (describing the process for permissible employment entrance examinations under 42 U.S.C. § 12112(d)(3)) ("A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant *and before the applicant begins his or her employment duties*, and may condition an *offer of employment* on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such examination (and/or inquiry) regardless of disability.").

The evidence as a whole with respect to whether Lane was "otherwise qualified" is this: Lane fully performed all job responsibilities without incident and without accommodation for five weeks; Lane received a full medical clearance from her own treating physician; the physical examination itself revealed no problems that would disqualify Lane; Workplace Health simply requested the FCE to determine her "physical capabilities"; the Workplace Health team did not know whether Lane was qualified or not, in the absence of an FCE, mostly because it thought Lane's medications listed in her medical records "raised suspectors" of cognitive and physical problems. (*See* ECF No. 34-2 at PageID.331, PageID.334, PageID.337.)

Fries indicated that had Lane passed a functional capacity evaluation, he would clear her for work. (*See id.* at PageID.337.) It's unclear, though, how a functional capacity evaluation would produce any better evidence than a five-week work history because the functional capacity evaluation (one snapshot in time) is supposed to test a person's ability to perform the job functions (which were performed without accommodation for five weeks). (*Compare, e.g., id.* at PageID.335 (Fries suggesting that the primary concern was whether Lane could "sit") *with* PageID.339 (Fries noting that even after learning Lane had been working (and sitting) for five weeks, his recommendation had not changed because he "felt" Workplace Health "needed objective data to determine whether or not she could perform the essential functions of the job").) Moreover, a functional capacity evaluation would not shed any light into any cognitive effect of Lane's medications (which Fries described raised a "suspector of a *cognitive* problem at work"), so it's unclear why Fries only recommended a

physical capacity examination. Fries also expressed concern to an MGH employee about Lane's medication.[14]

Regardless of Fries' assessment, Lane worked without any issues and without any accommodations for another five weeks. MGH then inexplicably terminated her for failing to "pass the post-offer physical," even though the physical itself revealed no problems, and the hold was initially recommended by a Physician Assistant and based solely on a document review of Lane's medical record.[15]

Finally, while the non-final Workplace Health determination *may* have been enough to create a very slight dispute in material fact, the final nail in the liability coffin for MGH is the fact that after terminating Lane, it offered her the job back twice, and at least once "without any conditions." (*See* ECF No. 33 at PageID.115.)

In response to one of the Court's questions at oral argument, MGH's attorney suggested he objected to any consideration of this evidence under Federal Rule of Evidence 408, but this objection appears nowhere in the papers. Indeed, this position is ironic given that *MGH itself* devoted a factual section in its own motion for summary judgment entitled, "Lane [r]efused [r]einstatement." (ECF No. 33 at PageID.115.) Because MGH itself cited record evidence establishing that it offered Lane the position back without conditions, and MGH did not object to the evidence as being inadmissible, MGH has waived any objection

---

[14] Workplace Health's continuing insistence on a functional capacity evaluation in the face of overwhelming evidence that Lane was qualified for the position would likely not survive "arbitrary and caprious" review in the ERISA context.

[15] If this case was one in the ERISA context, MGH and Workplace Health would likely fail to even meet an "arbitrary and capricious" standard of review. The self-evident purpose of a "pre-employment" screening is to prevent candidates from beginning employment who would not be able to meet the requirements of the position, not to punitively terminate someone because a Physician Assistant doing a document review found, for example, "a suspector of a cognitive problem at work." (ECF No. 34-2 at PageID.331.)

to the Court's consideration of this evidence at summary judgment. *See, e.g., Piazza v. Aponte Roque*, 909 F.2d 35, 37 (1st Cir. 1990) (noting arguments raised for the first time at oral argument are deemed waived).

Moreover, because the first offer was "made without any conditions," that offer does not fall within the scope of Rule 408. *Compare* (ECF No. 34-5 at PageID.371 ("If Ms. Lane is going to accept this offer of reinstatement, *which does not require a dismissal or withdrawal of her Charge of Discrimination*, she must notify MFC's Human Resources Director, Emmit Davis, of her acceptance . . . .")) *with* Fed. R. Evid. 408 (noting the inadmissibility of statements "made during compromise negotiations about the claim" or "offering . . . a valuable consideration in compromising or attempting to compromise the claim").

Thus, MGH's final word on the subject, having finally rejected Workplace Health's recommendation (albeit too late)—is that Lane was admittedly "otherwise qualified" under the meaning of the statute, without conditions or accommodations.

**3.  Lane was terminated "because of" her perceived disability.**

This is a direct evidence case. *See Ferrari*, 826 F.3d at 891 (describing the "direct method" as one where a "plaintiff suffered an adverse employment action because of his or her disability").

> *a.  The factual record in the light most favorable to MGH demonstrates that Lane was terminated because of a "medical hold," and the "medical hold" was in place solely because MGH (through Workplace Health) regarded Lane as having an impairment.*

36

The Court has already found that MGH (through Workplace Health) regarded Lane as having an impairment, as evidenced by its "medical hold." *See supra* Part III.1.

In the same vein, it is undisputed that MGH terminated Lane because of the "medical hold" (more aptly characterized as a recommendation since Lane had already been assigned duties), not because Lane refused to take an examination. (ECF No. 34-4 at PageID.363 ("Q: So why was Avis Lane subsequently terminated? A: She was terminated based upon discovery of the fact that she wasn't cleared to work by Workplace Health. Q: So the medical hold? A: Yes. . . . Q: Were there any other reasons for the termination? A: No.").)

> **b. *Since the factual record in the light most favorable to MGH demonstrates that Lane had offered to pay for the FCE, MGH cannot avoid liability by recasting the record as one where an employee refused to pay for a necessary medical examination.***

MGH attempts one final sleight of hand, arguing that it did not terminate Lane because it, through Workplace Health, regarded her as disabled, but rather because no one was willing to pay for a functional capacity evaluation and Lane "refused to submit" to the FCE.

Since the undisputed record reflects that Lane offered to pay for the functional capacity evaluation that would, in MGH's providers opinions, show whether she "otherwise qualified" to perform the essential functions of the position, MGH is not entitled to recast the record as "the employee was not willing to pay for an examination." *Cf. Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812–13 (6th Cir. 1999) (suggesting that because an existing employee had demonstrated "aberrant behavior" by "threatening other employees," the employer could require the employee to pay for an exam, but noting in any event, he was

"not otherwise qualified" to retain his position because of the threats).  (And again, this all assumes that requiring the FCE itself under these circumstances was lawful to begin with. *See supra* note 10.)

It is undisputed that Lane: a) offered to pay for the functional capacity evaluation; b) as a result of mutual conversation, it was suggested Lane obtain a note from her doctor's note in the interim instead; and c) even after Workplace Health did not change its recommendation, MGH never again mentioned, let alone gave Lane the opportunity to take, the functional capacity evaluation.

Because MGH knew that Lane was willing to pay for the functional capacity evaluation, and she never indicated anything to the contrary (i.e., "I am no longer willing to pay!"), its argument that it terminated Lane simply because no one would pay for the exam is a transparent veil that must be pierced. (*See* ECF No. 36-1 at PageID.569 ("Q: So just to summarize the September 24th meeting, you and Sheila discussed with Ms. Lane that she was placed on that—she wasn't released to work from Workplace Health and they wanted an FCE, right? A: Yes. Q: And then you said the FCE is really expensive and you didn't want to pay for it, right? A: I informed her that it was costly and by it being a limited position, that we couldn't justify it. When she met with Sheila and I, that's what we informed her of. Q: And then she offered to pay for the FCE? A: Yes.").)

MGH adopted Workplace Health's recommendation that, as of the date of termination, Lane was not "cleared" to work because of her medical impairments; rather than either paying for the FCE (though requiring an FCE is at least arguably unlawful after she began working) or allowing her to continue work (based on a five-week work history and

her own doctor's clearance, it inexplicably terminated her. She had no performance issues whatsoever. MGH terminated her because Workplace Health perceived Lane as having impairments and was not medically cleared as of the termination date.

In sum, this record reflects that Avis Lane was, in all likelihood, "perfectly able to perform [her] job," but was nonetheless "rejected" solely because Workplace Health had placed what to MGH was a mystery "medical hold," a badge of sorts, on Lane; MGH viewed Lane as capable but freely dispensable because of unconfirmed "fears," *see Daugherty*, 544 F.3d at 703, disguised by an already-broken policy, that Lane was somehow medically unworthy to continue her employment. Rather than either confirming those "fears" and engaging in an interactive process or putting them aside, MGH decided to ignore a statutory mandate in favor of that already-broken policy, cutting off the individualized inquiry prior to its completion.

## ORDER

For the reasons contained in the accompanying Opinion, and because the factual record in the light in the most favorable to MGH demonstrates that the EEOC is entitled to summary judgment as to liability, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 34) and **DENIES** Defendant's motion for summary judgment (ECF No. 32). This case will proceed to a jury trial for a damages determination.

**IT IS SO ORDERED**.

Date:    January 27, 2017                      /s/ Paul L. Maloney
                                            Paul L. Maloney
                                            United States District Judge